## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

THE ROXBURY/SOUTH END
TENANTS' COUNCIL, INC.,

Plaintiff,

v.

Civil Action No.

CORNERSTONE CORPORATION;
ROXSE RESIDENCES LLC; LINDA
EVANS;  ROBERT L. EVANS; and PAUL
E. TRYDER,

Defendants.

## COMPLAINT

### Summary

This is a civil action brought by the Roxbury/South End Tenants' Council, Inc., known as

the Roxse Tenant Council (the "Tenant Council").  The Tenant Council is elected by, and

represents the tenants of, a subsidized housing project of 346 dwelling units in Boston known as

"Roxse Homes."  The Tenant Council is the Limited Partner, with a 49 percent partnership

interest, in Roxse Residences Limited Partnership (the "Partnership"), a Massachusetts limited

partnership which owns Roxse Homes.  Roxse Residences LLC is the General Partner, with a 51

percent partnership interest.  It is controlled by the defendants Robert L. Evans and Paul E.

Tryder, who are also the principals in Cornerstone Corporation ("Cornerstone").  Cornerstone is

the Managing Agent of Roxse Homes, by contract with the Partnership.  Linda Evans is

Cornerstone's resident Property Manager at Roxse Homes.

The action arises under the federal Racketeering and Corrupt Organizations Act, 18

U.S.C. § 1961 *et seq.*; certain ancillary state claims are also alleged.  It alleges that the defendants

have, through a pattern of racketeering activity, acquired, maintained, and corruptly profited by an

interest in the Partnership and through it, in Roxse Homes, in their various roles as General

Partner, Management Agent, and Property Manager, through state and federal criminal acts

amounting to a pattern of racketeering activity, statutory and regulatory violations, common-law

fraud, and breach of fiduciary duty.  It seeks, among other remedies, to divest the defendants of

the interests so acquired and to require them to forfeit the proceeds of their criminal enterprise.

Venue in this District is pursuant to 18 U.S.C. § 1965.

Parties

1.      The plaintiff ROXBURY/SOUTH END TENANTS' COUNCIL, INC., known

as the Roxse Tenant Council, is a Massachusetts charitable corporation with offices at 1050

Tremont Street, Suite 102, Boston, MA 02120.  The Tenant Council is a membership

organization, and each household in Roxse Homes is automatically a member.  The Tenant

Council is governed by a 25-member Board of Directors (24 prior to November, 2005) elected

by the members at large (sometimes referred to as the "Board").  It consists of six officers and 19

representatives (18, before November, 2005) of the several buildings and/or floors.

2.      The Defendant ROXSE RESIDENCES LLC ("Roxse Residences") is a

Massachusetts limited liability company.  According to the records of the Secretary of State of

Massachusetts, its principal office is located at 725 Canton Street, Norwood, MA 02062.  On

information and belief, the principal offices of Roxse Residences are now located at 400 Blue

Hill Drive, Suite 2C, Westwood, MA 02090, c/o Cornerstone Corporation.  Roxse Residences is

the General Partner of the Partnership, with a 51 percent partnership interest.

3.      The Defendant CORNERSTONE CORPORATION ("Cornerstone") is a

Massachusetts corporation with a principal office at 400 Blue Hill Drive, Suite 2C, Westwood,

MA 02090.  Cornerstone has been the Management Agent for Roxse Homes since October,

2003.

4.     The Defendant ROBERT L. EVANS ("Robert Evans" or "Mr. Evans") is, with the defendant Paul E. Tryder, a co-manager of Roxse Residences and is a director and treasurer of Cornerstone.  On information and belief, Mr. Evans is a principal beneficial owner of Roxse Residences and a principal stockholder of Cornerstone.  Mr. Evans resides at Six Cobblers Lane, Ipswich, MA 01938.

5.     The Defendant PAUL E. TRYDER ("Tryder" or "Mr. Tryder") is, with the defendant Robert L. Evans, a co-manager of Roxse Residences and is a director and president of Cornerstone.  On information and belief, Mr. Tryder is a principal beneficial owner of Roxse Residences and a principal stockholder of Cornerstone.  Mr. Tryder resides at 24 Longmeadow Drive, Westwood, MA 02090

6.     The Defendant LINDA EVANS ("Linda Evans" or "Ms. Evans") is currently employed by Cornerstone as the full time Property Manager for Roxse Homes.  Ms. Evans, who resides in Roxse Homes at 105 Hammond Street, Apt 504, Boston, MA 02120, was the President of the Tenant Council at the time the Partnership acquired Roxse Homes from the United States Department of Housing and Urban Development ("HUD") and when Cornerstone entered into its contract with the Partnership to manage Roxse Homes. On information and belief, Robert Evans and Linda Evans have no familial relationship.

<u>Facts Common to all Counts</u>

<u>The HUD-MassHousing Demonstration-Disposition Program</u>

7.     Roxse Homes consists of one high-rise and ten low-rise apartment buildings in Roxbury Crossing, on the border of Roxbury and the South End, with a total of 346 residential units.  The address of the high-rise is 1050 Tremont Street, Boston.  Roxse Homes was

constructed in 1969 as subsidized housing by Roxse Homes, Inc., controlled by James Cofield ("Cofield"), for low-income tenants.  Construction was financed by a mortgage loan insured by HUD.

8.      The property was poorly constructed and mismanaged by Cofield.   From the outset Roxse Homes failed to make any principal payments on the mortgage, and in 1975 HUD paid the commercial lender and mortgagee $9.5 million for an assignment of the mortgage. In December 1992, HUD secured a court order authorizing it to replace the management of the project.  In 1994, by which time the debt secured by the mortgage had risen to $17 million, HUD foreclosed on the mortgage.  Cofield's mismanagement of the property has been the subject of extensive litigation.  See *Roxse Homes Limited Partnership v. Roxse Homes Inc.*, 399 Mass. 401 (1987); *Roxse Homes, Inc. v. Roxse Homes Ltd. Partnership***,** 83 B.R. 185 (D.Mass.1988); and *United States  v. Cofield*, 215 F.3d 164 (1st Cir. 2000).

9.      The Tenant Council was formed to represent the tenants in Roxse Homes in 1985 in reaction to Cofield's mismanagement of Roxse Homes.  In particular, Roxse Homes, which had been shoddily constructed, was rapidly deteriorating physically.  Necessary repairs and renovations were not carried out.

10.     During much of this period, defendant Linda Evans was employed by Cofield's property management company as Assistant Property Manager or Property Manager for Roxse Homes.  On information and belief, Ms. Evans was investigated by HUD at the time for illegally "selling" leases to apartments at Roxse Homes in violation of HUD's rules for tenant selection.

11.     The Tenant Council also successfully opposed Cofield's efforts to transfer Roxse Homes to Roxse Homes Limited Partnership, a California partnership without the resources to address the property's serious capital repair needs.  The Tenant Council was instrumental in

inducing HUD to foreclose its mortgage in January 1994, over Cofield's intense opposition.

Ultimately, HUD provided funding of almost $52 million for capital repairs to Roxse Homes.

12.     HUD assumed the management and control of Roxse Homes in December, 1992

as mortgagee in possession through its agent, Sentry Management.  On information and belief,

Sentry initially retained Linda Evans as its Property Manager, but dismissed her within several

weeks when it became aware of her mismanagement.  Since then, Linda Evans' activities with

respect to Roxse Homes have been directed at securing her position as Property Manager.

13.     At the urging of the Tenant Council, Roxse Homes became part of the HUD

Demonstration-Disposition Program (the "Demo-Dispo Program"), which was managed on

behalf of HUD by the Massachusetts Housing Finance Agency ("MassHousing"). Under the

Demo-Dispo Program, Roxse Homes (and a number of similar HUD-foreclosed properties in

Boston) were to be fully repaired, and then sold to qualified tenant-controlled ownership entities

for a nominal price with 15-year project-based Section 8 contracts, *see* 42 U.S.C. §1437f(0)(13)

and 24 C.F.R. Part 983.  The purpose was to make the properties affordable for low-income

tenants while assuring sufficient rental income for the operation and maintenance of the

premises.  Democratic resident participation and decision-making about questions of ownership,

design, and management were integral to the program.

14.     Both before and after the HUD takeover and foreclosure, the Tenant Council

pursued the objective of insuring that Roxse Homes be fully repaired so that it could provide

decent, safe, sanitary and affordable housing for low and moderate income households.  It

strongly supported the objectives of the Demo-Dispo Program, initially pursuing a limited-equity

cooperative ownership model for Roxse Homes.

15.     During the period after HUD took control of the property and after her dismissal

as Property Manager, defendant Linda Evans made systematic illegal efforts to obstruct the functioning of the Tenant Council.  On information and belief, her purpose at all times was to use the Tenant Council to recover her position as Property Manager, intending to criminally exploit it, as she did previously, through extortion of tenants and the receipt of illegal kickbacks from both contractors and employees.

16.     After her dismissal by Sentry Management, Linda Evans, who continued to be a resident of Roxse Homes, was elected as President of the Tenant Council on February 2, 1993. The Council Board of Directors removed her for cause on March 17, 1993, for flagrant violations of the Tenant Council by-laws, including actions taken without approval of the other officers and the elected Board members.

17.     Some time after her removal from office, Linda Evans was elected to the Tenant Council Board of Directors as a Building Representative, but was again removed for cause--for deliberately attempting, through obstreperous interruptions and even intimidation, to interfere with Board meetings and deliberations.

18.     A slate organized by Linda Evans was elected to the Tenant Council Board of Directors in 1996, with Marcia Scott as president and Linda Evans as Vice-President.  At least one of the new Board members was an employee of MassHousing's relocation consultant.  The consultant stood to gain substantial fees from the off-site relocation of Roxse Homes tenants during renovation work, creating a serious conflict of interest.  The previous Board of Directors had opposed such relocation as disruptive and unnecessary, preferring on-site relocation in the course of phased renovation. The new Board of Directors dropped its opposition and endorsed an off-site relocation plan.

19.     Around this time, Linda Evans was working as Resident Services Coordinator at

Grove Hall Apartments, another HUD/MassHousing Demo-Dispo project, while serving as Vice-President of the Tenant Council.  As Resident Services Coordinator at Grove Hall, Ms. Evans reported to the MassHousing Asset Management Division, which was also in charge of Roxse Homes.  This conflict of interest violated MassHousing's written standards for the independence of resident tenant organizations.

20.     During the period from 1996-98, Linda Evans continued to undermine the functioning of the Tenant Council Board, even though it was led by a President elected with her on the same slate.

21.     On information and belief, Ms. Evans seized effective, permanent control (until 2005) of the Tenant Council in 1998 when the then President, Marcia Scott, effectively withdrew from all Tenant Council activities, and Ms. Evans became *de facto* "President."

22.     It is difficult to document the activities of the Tenant Council from 1998 through 2005.  When the current Board of Directors was elected in 2005, it discovered that virtually all Tenant Council records, official, financial and otherwise, had disappeared from the Tenant Council offices, which were then located within the Cornerstone management offices at the Roxse Homes site.  The missing records, filling several file cabinets, include the voluminous documents recording the selection of Cornerstone and Roxse Residences as General Partner and Managing Agent, the transfer of Roxse Homes to the Partnership, documents concerning management operations and the provision of resident services, and records showing whether and how the Board carried out its functions, such as minutes, attendance lists, and recorded votes. Even the Partnership Agreement, the foundational document governing the relationship between the Tenant Council and Roxse Residences, and the Management Agreement between the Partnership and Cornerstone were missing.

23.     On information and belief, these documents were deliberately removed and/or destroyed by the defendants.  Their disappearance has not been explained, and the documents have not been produced after a written demand to defendants on behalf of the Tenant Council dated July 28, 2005.  On information and belief, one reason for the removal and/or destruction of these records was to conceal the fact that the Tenant Council Board of Directors did not function independently after the 2001 "elections" described below, while Linda Evans acted in its name.

24.     The Tenant Council has been able to reconstruct certain of its corporate and financial records through a request to MassHousing under the Freedom of Information Act first made on October 21, 2005.  Under its standard policies, MassHousing charged the Tenant Council over $6,000 for the production of these documents.

25.     Linda Evans, who was effectively running the Tenant Council at that time, organized an improper vote of the membership, in violation of the Tenant Council by-laws, to cancel the regularly scheduled elections of the Tenant Council for September 1998, illegally extending her term as Vice President and those of the other officers contrary to the Tenant Council by-laws.  By various means Ms. Evans resisted and defeated all tenant efforts to nullify this improper vote or to call a proper election, under the by-laws, to elect a properly-constituted Board of Directors.

26.     A purported "election" was held in May, 1999, in which Linda Evans was elected President of the Tenant Council, along with five additional officers.  On information and belief, this election was not held in conformity with the Tenant Council by-laws, and no election was held for many or most of the 18 members of the Board of Directors who are Building Representatives.  At least ten of these seats were never filled by any method, legitimate or illegitimate, during this term.

27.     In violation of the by-laws which provide for the election of Building Representatives to the Board, the purported Board members appointed some Building Representatives to vacant seats at meetings held on June 3 and 22, 1999.  These included at least one director who was also an employee of the then Management Agent, in violation of the MassHousing policy against conflicts of interest.

28.     Another purported "election" was held in September, 2001, at which only four of the six officer positions were filled.  Linda Evans was again elected President and Alexa Rentas was elected Vice President.   The Election Notice made no mention of the 18 Building Representatives whose seats were vacant, despite written demands from tenants that an election be held for these positions.   None of the 18 Building Representatives were ever elected.

29.     Evans called another Membership Meeting for October 30, 2001.  Rather than hold the announced election to fill the remaining 20 seats on the Board of Directors (2 officers and 18 Building Representatives), Linda Evans introduced a "civility bylaw" at a special meeting of tenants supposedly giving the Board the power to bar any resident deemed by it to be acting "uncivilly" from running for the Board or voting in any election.  The intent was to bar James McNeill, the leader of the tenants who had been calling for proper elections, from running for office and from participating in Tenant Council affairs, and thereby to intimidate others.  The by-law was ostensibly adopted at a membership meeting on January 29, 2002.  This "by-law" was ultimately deemed illegal and unenforceable by the Massachusetts Attorney General's office.

30.     After the 2001 "election," the four officers, calling themselves the "Executive Board" (a title unknown to the by-laws), made all decisions committed by the by-laws to the 24-member Board of Directors.  The "Executive Board" also regularly decided "significant matters" reserved by the by-laws to the membership at large, including most significantly the selection of

a General Partner and Management Agent.  It appears, in fact, that after Roberto Carrington, the

Tenant Council Treasurer, resigned in late 2002, there were only three officers on the "Executive

Board."

31.     The 2001 "elections" were the last elections held until June, 2005, although Ms.

Evans regularly announced elections that were ultimately never held.  Ms. Evans engineered a

vote at a membership meeting on May 27, 2003, to postpone the September, 2003 elections for

one year.  This "postponement" was not authorized by the by-laws.  No elections were held in

2004, either.

32.     The scheduling of elections that were never held was part of Linda Evans'

scheme to misrepresent the Tenant Council Board of Directors to MassHousing, the Secretary of

State, and other bodies as properly constituted, and therefore qualified to select a General Partner

and Management Agent for the Partnership; see ¶ 36, *infra*.

33.     After the elections in 1996 in which Linda Evans was elected Vice President, no

proper or legally valid elections were held by the Tenant Council until June 2005.  During that

period, Linda Evans seized effective control of the Tenant Council, holding elections only for the

officer positions, and "appointing" additional "directors" from time to time, all in violation of the

Tenant Council's by-laws.

34.  During the period from 1998 to 2005, Linda Evans and her appointees took

numerous actions in the name of the Tenant Council, including introducing and selecting

defendant Cornerstone and Roxse Residences candidates for Management Agent and General

Partner, respectively, rather than one of three other, better-qualified candidates; causing

MassHousing to dismiss the then Management Agent, Maloney Properties, despite its

satisfactory performance; causing MassHousing to hire defendant Cornerstone Corporation, as

Management Agent for Roxse Homes; and arranging for Cornerstone to hire Linda Evans as

Property Manager while she was still exercising the powers of President of the Tenant Council.

35.     In 2003, the capital repair program at Roxse was nearly complete, and

MassHousing determined that, under the guidelines of the Demo-Dispo Program, the Tenant

Council was eligible to participate in the ownership entity as a 49 percent limited partner, and to

take part in the selection of the 51 percent general partner.

36.     At that time, MassHousing determined that the Tenant Council was

"democratically elected in accordance with the by-laws" and that the organization "had

continued to follow the bylaws of [the] organization."  These determinations were made despite

the fact that only five of the 24 positions on the Board of Directors were then occupied, and that

of the five, only three, Linda Evans, Alexa Rentas, and Aaron Jones, had ever been "elected" (in

the improper 2001 election) with the remainder having been "appointed" by Evans.  It is unclear

whether the other Board members regarded themselves as having been appointed by Evans, or

whether Evans simply identified them to MassHousing as Board members without their

knowledge or consent.

37.     By June, 2003, Linda Evans had forced the elected Secretary, Aaron Jones, to

resign.  It appears that this was the result of his attempting in January, 2003 to call her illegal

activities to the attention of MassHousing.

38.     In early 2003, MassHousing held a workshop for organizations interested in

acquiring a 51 percent interest in Roxse Homes as General Partner. Four companies applied:

United Housing Management, Urban Edge Housing Corporation, Nuestra Comunidad and

Cornerstone/Roxse Residences.  An important feature of the Partnership was that the General

Partner would be entitled, through an affiliate, to manage Roxse Homes for a significant

management fee.

39.     Unlike the other three applicants, Cornerstone/Roxse Residences was relatively unknown as a general partner and manager of affordable developments similar to Roxse Homes. On information and belief, Linda Evans originally advanced Cornerstone/Roxse Residences as a candidate in accordance with a secret and corrupt bargain for her re-employment as Property Manager and for other illegal consideration.

40.     Ms. Evans fraudulently induced MassHousing to approve Cornerstone/Roxse Residences by representing to MassHousing that her decisions were actually those of persons whom she claimed to be officers and directors of the Tenant Council, but who had never been elected.

41.     On information and belief, Linda Evans' support for Cornerstone and Roxse Residences was procured by a corrupt bargain.  In consideration for her illegal and fraudulent manipulation of the tenants, the Tenant Council, MassHousing and HUD to install Roxse Residences as General Partner and Cornerstone as Management Agent, Linda Evans was promised, and actually received, the position of Property Manager at Roxse Homes. Linda Evans may have been further induced to support Cornerstone and Roxse Residences by a cash payment, or may have extorted such payment from Cornerstone and/or Roxse Residences, and/or their principals, Robert Evans and Paul Tryder, as a condition of her support.

42      Under the Tenant Council by-laws, the choice of Cornerstone and Roxse Residences as a partner in the ownership and operation of Roxse Homes was a significant matter affecting the future of the property, as to which a general vote of the membership was required. No such vote was ever held, nor did any members of the Board of Directors, however chosen, vote on the issue at a properly constituted meeting.

43.     What is more, the defendants were able to install Cornerstone as Management Agent, and Linda Evans as *de facto* Property Manager in advance of Roxse Residences participation in the Partnership.  In October, 2003, six months before HUD transferred Roxse Homes to the Partnership, the defendants induced MassHousing as HUD's agent to terminate Maloney Properties as Management Agent for Roxse Homes and engage Cornerstone in its place.

44.     On September 18, 2003, Linda Evans signed a long-term lease of a Ricoh copier, ostensibly on behalf of the Tenant Council, requiring monthly payments of $158 for 60 months. On information and belief, Linda Evans entered into this lease without the knowledge and approval of the Tenant Council Board and without an authorizing vote.  The copier thus leased has been kept since its delivery on or about October 1, 2003, in the Cornerstone Management offices at the Roxse Homes and has been used solely for Cornerstone purposes.  No payments were ever made on the lease, and the Council is now being dunned for $7,736.83 in unpaid arrears.

45.     In November of 2003, Cornerstone hired Alexa Rentas ("Rentas"), who until a month earlier had been Vice-President of the Tenant Council, as Assistant Property Manager. Rentas' resignation as Vice-President left Linda Evans as the sole remaining director of the Tenant Council who had ever been elected, the remaining three directors (of the 24 then required in the by-laws) having been "appointed" by Evans.

46.     On information and belief, Rentas served as a mere figurehead or rubberstamp for Linda Evans.  During the period from October, 2003 until April, 2004, Linda Evans had improper access to tenant files, dealt with property contractors, interviewed and hired staff on behalf of Cornerstone, and performed other functions of Property Manager, all the while serving

as President of the Tenant Council.

47.     The Agreement of Limited Partnership of the Partnership (the "Partnership Agreement"), Ex. A, was executed on February 23, 2004 by Linda Evans, in her capacity as President of the Tenant Council, and by Robert Evans and Paul Tryder in their capacity as Managers of Roxse Residences.

48.     Roxse Homes was transferred to the Partnership on March 7, 2004.

49.     Less than one month later, Robert Evans announced at a Special Meeting of Tenant Council on April 6, 2004, that Linda Evans had been hired by Cornerstone as Property Manager.  There is no evidence that this appointment was approved by the Board of Directors of the Tenant Council (as required by the Partnership Agreement) or by its membership (as required by its by-laws).

50.     However, just as Linda Evans acted as Property Manager before Cornerstone actually hired her, she continued to exercise the powers of Tenant Council President while simultaneously serving as Property Manager.  During the period from April 26 through September 10, 2004, Ms. Evans signed at least 32 checks drawn on the Tenant Council account, totaling not less than $18,045.50.

51.     Among the Tenant Council checks signed by Linda Evans after she was appointed as Cornerstone's Property Manager was one for $5,250 dated April 16, 2004, drawn to the order of the National Center for Housing Management.  On information and belief, this was a payment for tuition for Linda Evans' training as Property Manager of Roxse Homes.  Thus Ms. Evans, when no longer a Tenant Council officer, misappropriated Tenant Council funds for her personal use and benefit and that of Cornerstone, her employer.

52.     MassHousing registered its strong objection to the proposed hiring of Linda

Evans on conflict-of-interest grounds by letter dated April 1, 2004 (Robert Pyne, Director of Rental Development, to Robert Evans), stating "[w]e urge you to carefully reconsider this matter in the light of the serious ethical issues it raises."  However, on information and belief, MassHousing did not take any further action to prevent the appointment from being carried out.

53.     On information and belief, as further compensation for Linda Evans's corruption of the Tenant Council and other illegal efforts to procure them their role as General Partner and Management Agent of Roxse Homes, Cornerstone and Roxse Residences, and their principals Robert Evans and Paul Tryder, have collaborated with Linda Evans, conspired with her, and turned a blind eye toward her criminal activities and misappropriation of funds as resident Property Manager.

Management of Roxse Homes without consultation with and approval of Tenant Council

54.     Evans resigned as Tenant Council President when Cornerstone hired her as Property Manager in the spring of 2004.  From then until the dissident elections of June, 2005, there was not a single Board member duly elected by the Tenant Council.  The "Executive Board" then in power (D'Anthony Clark, Carmen Storms, Viola Cooper and perhaps others) were all "appointed" by Evans.  An election was called for October, 2004, but it was canceled after the Office of the Attorney General intervened, having been made aware of the manifestly illegal conditions under which it was to be held.

55.     The tenants at Roxse Homes finally forced, by an initiative petition, a general election on June 11, 1005 for all 24 seats on the Tenant Council Board of Directors.  The old 3-member "Executive Board" which, on information and belief, was still being advised and directed by Linda Evans, contested the validity of this election, but its results were ratified by the members in a second election on June 25, 2005, monitored by several Massachusetts elected

officials and the Massachusetts Attorney General's office.

56.     The new Board demanded in writing that defendants Cornerstone and Roxse

Residences, and their principals Robert Evans and Paul Tryder, review whether the appointment

of Linda Evans as Property Manager was proper and should continue, invoking the right of the

Tenant Council under the Partnership Agreement to review and approve all senior site staffing

decisions.

57.     The defendants refused the demand.  Mr. Evans' stated grounds were that all

such decisions were ratified by the prior "Board of Directors" and could not be revisited.  But

defendants have not produced any documentation of such ratifying votes, which, if they ever

existed, must have been among the documents that "disappeared" from the Tenant Council

offices under defendants' control.

58.     Instead, defendants produced newly-drafted "certifications" from D'Anthony

Clark, Viola Cooper, and Carmen Storms dated September 15, 2005, each attesting that he or

she, as board member, "was consulted with and approved the hiring of Linda Evans as the

Property Manager for Roxse Homes."  These "certifications" did not include any

contemporaneous documentation of votes by the "Board," or state any date on which such

"consultation" had taken place.  On information and belief, there was no such consultation, and

at least one of the three "board members" has since disavowed her certification, stating that she

did not know the meaning of the document she was asked to sign.  As noted above, these persons

were not in any event legally elected and serving as members of the Tenant Council Board of

Directors.

59.     Moreover, Linda Evans and Cornerstone illegally hired an Assistant Property

Manager without the required participation of the Tenant Council Board. On September 21,

2005, Cornerstone asked the Tenant Council Board, in writing, to approve its candidate, Deborah Huff ("Ms. Huff").  The Tenant Council made numerous attempts to arrange an interview with Ms. Huff, but received no response from Cornerstone.  When the Tenant Council attempted to arrange an interview with Ms. Huff directly for October 18, 2005, she informed Board members that Cornerstone had already hired her and she had begun work on September 27, 2005.

60.     The Tenant Council renewed its invitation to Ms. Huff and met on October 18, 2005 to interview Ms. Huff, but she did not appear.  The Board therefore rejected her promotion to Assistant Property Manager under Article 4.7 of the Partnership Agreement and so notified Cornerstone.  A specific reason for the rejection, apart from Cornerstone's refusal to abide by the process, was that neither Linda Evans nor Ms. Huff speak Spanish, whereas a large number of the residents of Roxse Homes are Spanish speakers, and many do not have a full command of the English language.  Cornerstone ignored the Board's decision and continued to employ Ms. Huff.

61.     Cornerstone further hired a Resident Services Coordinator, another senior on-site management staff member, without any notice to or consultation with the Tenant Council.

62.     In the last year, Cornerstone has twice replaced the company providing security at Roxse Homes–first Wackenhut Security Company, then Naratoone Security Corporation, and finally New World Security, without meeting with the Tenant Council and despite its remonstrances.  New World Security was not even on the list of five candidates that Cornerstone submitted to the Tenant Council.  Despite a written demand dated August 3, 2006, Cornerstone has not supplied the Tenant Council with copies of either the Naratoone or New World contracts.  This change is associated with a 12 percent increase in the security budget as submitted by Cornerstone to MassHousing for fiscal year 2007.

Additional Failures to Comply with Partnership Agreement

63.     Cornerstone and Roxse Residences have further violated, and continue to violate, Art. 4.7 of the Partnership Agreement, which gives the Tenant Council approval over the Annual Operating Budget (not to be unreasonably withheld); all capital improvements with a cost in excess of $10,000; selection of all vendors with annual contracts exceeding $2,500; and contracts and arrangements for the provision of security.

64.     Cornerstone's fiscal year 2006 budget for Roxse Homes was adopted without Tenant Council approval. Cornerstone then requested a six percent across-the-board increase in rents from MassHousing pursuant to said budget.  Cornerstone's management fee equals 5.51 percent of the effective rental income paid monthly, so a six percent rent increase would increase its management fee by a like percentage.

65.     The Tenant Council successfully challenged such rent increase on the grounds that current cash surpluses made it unnecessary; on account of Cornerstone's failure to make good its improper withdrawal of $300,000 from the Operating Account to cover capital improvements and equipment costs for which it was solely responsible; because of grossly excessive line items for certain subcontracts, including security, snow removal, and items neither identified nor explained; because of Cornerstone's serious deficiencies in ordinary maintenance and repairs; and other problems.

66.  On March 16, 2006, HUD and MassHousing denied the rent increase to Cornerstone, determining, *inter alia*, that Cornerstone had a cash surplus from the previous year's operations of $473,946.  As a penalty for Cornerstone's improper diversion of operating funds to pay for unauthorized capital expenditures of $300,000, MassHousing also withheld

owner fees from Cornerstone in the amount of $37,534.

67.  In response to the actions of HUD and MassHousing in denying the rent increase,
Cornerstone undertook a campaign of slanderous misrepresentation to frighten the tenants into
believing that essential tenant services would be cut as a result of the Tenant Council's
successful opposition to unwarranted rental increases.

68.  On March 30, 2006, Robert Evans addressed a meeting of all residents to solicit
their support for a petition to increase their rents.  He "advised" them of such "facts" as that the
Tenant Council desired to take over the Seniors Lounge for use as its office.  He stated:

> They [the Tenant Council] are obsessed with a desire for revenge which they
> pursue at all costs with lies and false accusations. . . . In a misguided effort to
> stop a rent increase Jimmy McNeill has convinced Mass Housing to make
> budget cuts which are very harmful to you as residents.

He further stated that as a result of the budget cuts utilities such as heat, lights and water would
be turned off every fifth day and summer camp for the children, all Boys and Girls Club
activities, all youth trips, and all senior activities would be eliminated.  These were gross
falsehoods.  On April 4, 2006, defendants delivered a copy of the speech to every household in
Roxse Homes.

69.  Cornerstone did submit its proposed fiscal year 2007 budget, proposing a rent
increase of 6.5 percent and an increase in its operating budget of 15 percent, to the Tenant
Council for review.  The Tenant Council's analysis showed that once again a rent increase was
unnecessary and by letter dated November 26, 2006, requested that Cornerstone work with it to
prepare a new budget.

70.  As a result of the Tenant Council's efforts, Cornerstone withdrew its proposed
rent increase by letter dated December 12, 2006.  However, Cornerstone continues to violate Art.
4.7 of the Partnership Agreement by failing to seek or obtain the approval of the Tenant Council

for vendor contracts above $2,500, or to allow the Council to inspect such contracts.

71.     Under the Partnership Agreement, the Tenant Council has a veto over the Partnership's choice of certified public accountants.  But when the Tenant Council met with the Partnership accountants, Cornerstone immediately fired them.  It then retained a new firm to conduct the 2005 audit without notifying the Board or submitting its choice to the Tenant Council for approval.

Favoritism in allocation of apartments.

72.     Tenants at Roxse Homes, when they returned to the building after renovation, were supposed to be allocated apartments substantially equivalent in size and location to those previously occupied.  Instead, Linda Evans and Cornerstone used the reallocation to reward political supporters, including Cornerstone employees, by providing them with larger and better apartments, and to punish dissidents by giving them smaller and worse apartments.  On information and belief, these improper allocations were concealed by fraudulent tenant records.

Illegal interference with protected tenant activities

73.     Since the election in June, 2005 of the current Board of Directors to leadership of the Tenant Council, defendants have grossly and consistently interfered with the Tenant Council in its efforts to carry out its business and provide services to the members, in violation of HUD regulations, 24 CFR Part 245, by, *inter alia*:

(a)     Denying the Tenant Council adequate office, meeting and storage space after repeated demand, even changing the locks to prevent access to common areas for meetings;

(b)     Denying the Tenant Council access to water and electricity in connection with events held by it for all the residents of Roxse Homes;

(c)     Sending management representatives to attend tenant meetings uninvited and

without the permission of the Tenant Council, specifically including Linda Evans, in violation of

24 CFR§ 245.115, with the purpose and effect of interfering with the independence of the Tenant

Council as a legitimate tenant association.  In fact, Linda Evans seriously disrupted a tenant

meeting on November 1, 2005, to which she was not invited, by constant and vociferous

speeches and objections, entirely out of order, after a written request to Cornerstone to exclude

her;

   (d)  Denying the Tenant Council access to the bulletin boards in each building for the

posting of notices, by refusing to provide the officers with keys to the glass cabinets housing

them;

   (e)  Tearing down notices posted on walls; and

   (f)  Throwing out property owned and/or rented by the Tenant Council and used in

connection with tenant events.

   74.  Because of Cornerstone's refusal to provide adequate meeting space, secure

against intrusion and eavesdropping, the Tenant Council has been compelled to rent space

outside Roxse Homes to hold meetings and carry out its business.

Violation of duty to train and prepare the Tenant Council for sole ownership.

   75.  The Partnership Agreement conceives of the Partnership as an interim step

toward sole tenant management and control within five years of its establishment—i.e., by

February 23, 2009.  Partnership Agreement § 11.1.  The General Partner has covenanted to

manage Roxse Homes "with the goal of maximizing the empowerment and participation of the

residents of Roxse Homes regarding their housing and social services environment," Partnership

Agreement § 4.1(a).  To this end, Roxse Residences was and is specifically obligated under the

Partnership Agreement to make the Tenant Council ready to assume all the responsibilities of

management.  Roxse Residences has failed to do so.

<u>Illegal evictions</u>

76.     Linda Evans and Cornerstone, as Management Agent, have attempted to evict, and, on information and belief, have actually evicted several tenants for non-payment of rent, in violation of their Occupancy Agreements, by failing and refusing to adjust their rents in accordance with their incomes.

77.     On information and belief, these evictions were intended:

(a) To injure such tenants by illegally depriving them of the value of the federal rent subsidy to which they are entitled;

(b) To retaliate against Tenant Council supporters and officers for their legally-protected activities as members of a tenants' union in violation of G.L.c. 186, § 18 and the terms of the Partnership Agreement.  Whether or not such eviction was successful, such tenants were put to great trouble, incurred substantial legal expenses, and suffered serious emotional distress;

(c) By evicting such tenants, to terminate their positions as members and officers of the Tenant Council pursuant to the by-laws of the Tenant Council, Art. 4.1;

(d) To intimidate other Tenant Council officers and members who are opposed to or might express opposition to the actions of Linda Evans and Cornerstone;

(e) on information and belief, to create vacancies which may be filled by illegally selling tenancies; and

(f) on information and belief, by handpicking new tenants under obligation to Linda Evans, to change the composition of the tenant body so as to elect a new leadership under her control.

78.     On information and belief, Linda Evans has illegally discriminated in her choice

of tenants by national origin, preferring tenants who are not fluent in the English language nor conversant with the American legal system and their rights thereunder.  Such tenants are more easily subjected to extortion and political manipulation.

79.     By choosing tenants in accordance with illegal criteria, including their ability and willingness to pay "key money," Linda Evans and Cornerstone have violated their duty to maintain the waiting list for apartments equitably and in accordance with neutral criteria.

80.     In connection with its illegal attempt to evict George Jones, Treasurer of the Tenant Council, Cornerstone obtained a copy of his 2005 federal tax return from the Internal Revenue Service by criminal misrepresentations in violation of law, including 5 U.S.C. § 552a(i)(3) and 18 U.S.C. § 1001.

Excessive cash fees for services; illegal kickbacks

81.  Cornerstone had, until December 12, 2006, charged excessive fees to residents for such services as opening the apartment doors of tenants accidentally locked out–up to $75–and painting apartments–$150.   Residents have been required to pay in cash and they have received no receipts even when demanded.  There was no published schedule of such fees and, until December 12, 2006, the "cash only" policy has never been posted or distributed in writing.  The plaintiffs are informed that maintenance men employed by Cornerstone, as a condition of retaining their jobs, kick back a portion of these cash fees to Linda Evans, and keep the remainder.  On information and belief, these cash receipts are not properly recorded in the books and records of the Partnership.

82.     On December 12, 2006, in response to a demand from the Tenant Council, Cornerstone provided a schedule of fees to repair damage for which tenants are responsible and for lockouts.  The schedule is dated March 15, 2004, although it has not been posted.  It states, in

English and Spanish, "NO CHECKS WILL BE ACCEPTED.  NO SERVICE WILL BE PROVIDED UNTIL PAYMENT IS RECEIVED IN FULL."

## COUNT I

83.	The allegations of the Summary and of  ¶¶ 1-82, *supra*, are hereby realleged and incorporated into this Count I by reference.

84.	Roxse Residences Limited Partnership is an enterprise whose purpose is the operation of federally-subsidized housing, 42 U.S.C. § 1437f, and which is engaged in interstate commerce, and the activities of which affect interstate commerce, within the meaning of 18 U.S.C. § 1962(c).

85.	The defendants conspired together to acquire and maintain their controlling interest in the Roxse Residences Limited Partnership, and thereby in Roxse Homes, through a pattern of two or more related acts of racketeering as defined in 18 U.S.C. § 1961(1),  in violation of 18 U.S.C. § 1962 (c) and (d).

86.	The defendants' acts of racketeering activity include numerous acts of mail and wire fraud within the meaning of 18 U.S.C. §§ 1341, 1343, involving the use of the mails, telephone, email, and private or commercial interstate carrier.

87.	These acts of mail and wire fraud include the deprivation of the right of the Tenant Council and its members to have the affairs of the Partnership conducted honestly, fairly, and free from corruption, dishonesty, fraud and conflicts of interest, in violation of 18 U.S.C. § 1346.  Such right is derived from the duty of loyalty and fairness to the Partnership and its partners set forth in, and implied by, the Partnership Agreement, and the other duties and contractual obligations imposed on Cornerstone and Roxse Residences as conditions of their acquiring their interests in the Partnership and in Roxse Homes, as set forth more particularly in

¶ 98, *infra*.

88.     The pattern of racketeering here alleged also include multiple violations of the Hobbs Act, 18 U.S.C. § 1951, by extorting money from tenants, employees and contractors by putting them in fear.

89.     The defendants' actions were aimed at fraudulently depriving the Tenant Council and its members of tangible property, including without limitation monies extorted from actual and potential tenants in "key money," overcharges for services, and excessive rent; and monies which disappeared from, and were on information and belief, embezzled from, the Tenant Council's bank accounts.

## COUNT II

90.  The allegations of the Summary and of  ¶¶ 1-82, *supra*, are hereby realleged and incorporated into this Count II by reference.

91.   The various unfair and deceptive acts and practices of the defendant Roxse Residences alleged herein by means of which it acquired its interest as General Partner in Roxse Residences Limited Partnership violated G.L. c. 93A, § 7.

92.   The various unfair and deceptive acts and practices of the defendant Cornerstone Corporation alleged herein by means of which it acquired its management contract with the Roxse Residences Limited Partnership violated G.L. c. 93A, §7.

93.  The various actions taken by the defendants  Cornerstone and Roxse Residences LLC in retaliation against the Tenant Council's exercise of its protected rights on behalf of its tenant members in violation of G.L. c. 186, § 18, constitute an unfair or deceptive act or practice in the conduct of a trade or business in violation of G.L. c. 93A, § 7, *see* 940 CMR § 3.17.

94.     By letter dated March 21, 2007, and served upon the several defendants on or

about March 23, 2007, supplemented by further letters dated March 26 and March 28, 2007, the

Tenant Council made demand upon the defendants pursuant to G.L. c. 93A, §9(3) with respect to

its claims under Chapter 93A and the other allegations set forth in the Complaint.

95.     By letter dated March 30, 2007, the defendants Roxse Residences LLC and

Cornerstone Corporation responded to the several demand letters by denying all allegations

contained therein and specifically rejecting chapter 93A as the appropriate statutory basis for the

claims set forth.  The defendants made no offer of settlement or compromise with respect to any

demand.

96.     The plaintiff Tenant Council has therefore satisfied all the statutory conditions

precedent to bringing this count pursuant to Mass. Gen. Laws §93A.

## COUNT III

97.     The allegations of the Summary and of ¶¶ 1-82, *supra*, are hereby realleged and

incorporated into this Count I by reference.

98.  Roxse Residences LLC has committed numerous acts in breach of the Partnership

Agreement and specifically of its duty of care under § 4.3 of the Partnership Agreement to:

(a) refrain from engaging in gross negligence;

(b) refrain from engaging in intentional misconduct;

(c) refrain from a violation of the duty of loyalty owed to the Partnership;

(d) act in accordance with Mass. Gen. Laws c. 109;

(e) act in accordance with the Regulatory Agreement between the Partnership and

MassHousing;

(f) act in accordance with riders attached to the HUD Contract for Sale and the Deed

from HUD to the Partnership;

(g) act in accordance with the Housing Assistance Payments Contract between HUD and the Partnership with regard to the provision of rental subsidies at Roxse Homes;

(h) act in a manner consistent with sound business and asset management practices.

### REMEDIES

99.  The remedies sought by the plaintiffs herein include:

(a)     The termination of the management contract between Cornerstone the Partnership;

(b)     The removal of Roxse Residences as a partner in the Partnership;

(c)     A complete accounting of the assets, income and expenditures of the Partnership;

(d)     An accounting of the assets, income and expenditures of the Tenant Council for the period before July 1, 2005;

(e)     A judgment for thrice the actual damages equal to the losses occasioned to the Tenant Council and to its tenant members as a result of Cornerstone's mismanagement, misappropriation of fees, suborning of bribes, extortion of kickbacks, preferential treatment of certain tenants, and legally unfounded and retaliatory evictions, including costs and attorneys' fees, in accordance with 18 U.S.C. § 1964(c);

(f)     A judgment for thrice the actual damages suffered by the Tenant Council and its tenant members as a result of the defendants' actions in retaliation against them for their exercise of their protected rights, plus attorneys' fees, in accordance with Mass. Gen. Laws c. 93A;

(g)     An order requiring Cornerstone Corporation to account for all sums it has received as Management Agent for Roxse Homes, and a judgment in such amount;

(h)     An order requiring the individual defendants to divest themselves of all interests that they may have in Cornerstone, Roxse Residences, and the Partnership, and to account for all

the proceeds that they have received on account of their violations of 18 U.S.C. § 1962 for four years previous to the date of the filing of this Complaint, including without limitation bribes, kickbacks, the proceeds of extortion, wages, salary, bonuses, shares, options, pension rights, the value of all employment-related benefits, such as life, medical and disability insurance, and the use of property belonging to the enterprise for their private benefit; and any property into which such proceeds may be traced;

(i)     A judgment for the plaintiff equal to the value of all such immediate and mediate proceeds;

(j)     An order barring the defendants from further investment and/or participation in the business of residential real estate management and in real estate acquisitions in which HUD and MassHousing are involved in any way;

(k)     An order barring Linda Evans from further participation in the affairs of the Tenant Council as member, elected representative or officer notwithstanding her continued residence in Roxse Homes;

(l)     Such other and further relief as may to this Court seem just.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff ROXBURY/SOUTH END TENANTS' COUNCIL, INC.

prays this honorable Court for judgment in its favor and an order for the relief sought herein.

## PLAINTIFF DEMANDS TRIAL BY JURY

Respectfully submitted,
ROXBURY/SOUTH END TENANTS' COUNCIL, INC.
by its attorney,

/s/ David J. Fried

David J. Fried, BBO #179640
LAW FIRM OF DAVID J. FRIED
24 Thorndike Street, Suite 300
Cambridge, MA 02141
(617) 577-8090
Dfried@fried-law.com

Dated:  April 3, 2007

## VERIFICATION

James McNeill, as duly elected President of the Plaintiff Roxbury/South End Tenants' Council, Inc., affirms that he has read the above complaint against CORNERSTONE COR-PORATION; ROXSE RESIDENCES LLC; LINDA EVANS; ROBERT L. EVANS; and PAUL E. TRYDER, and that the allegations therein are true to his personal knowledge, except insofar as they are alleged upon information and belief, and as to those he believes them to be true.


__/s/ James McNeill____
        James McNeill

**MIDDLESEX**, ss:


JAMES McNEILL personally appeared before me on the third day of April, 2007, and made oath, on pain of perjury, in accordance with the foregoing Verification.


___/s  David J. Fried_____
David J. Fried, Notary Public